FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV 0 9 2009

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| - versus - | ) | NO. 1:08-CV-0113-CC |
| | ) | |
| $33,330.00 IN UNITED STATES | ) | |
| CURRENCY and TEN PIECES OF | ) | |
| JEWELRY VALUED AT $27,750.00,) | | |
| | ) | |
| Defendants. | ) | |

## CLAIMANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED

COMES NOW TONY AYOOLA, Claimant in the above styled

matter, and pursuant to Local Rule 56.1B(2), files this, his Statement of

Material Facts as to Which There is a Genuine Issue to be Tried and

responds to Plaintiff UNITED STATES OF AMERICA'S Statement of

Material Facts as follows:

I.     RESPONSE TO UNITED STATES OF AMERICA'S
       STATEMENT OF MATERIAL FACTS:

1.

Not controverted.

2.

Not controverted.

3.

Not controverted.

4.

Not controverted.

5.

Not controverted.

6.

Denied.  Ayoola released Jones and allowed her to leave the home.
Ayoola dep., p. 84, line 11-19; Ex. 1 to Davis dep.  In her own written
statement to the police, Jones wrote that just prior to leaving the residence,
she asked Ayoola to let her go.  According to Jones, Ayoola then said
"okay," and went upstairs, at which time Ms. Jones left the home. Ex. 3, p. 3
to Davis dep.; Ex. 3, p. 3 to Foster dep.

7.

Not controverted, although Claimant Ayoola deposed that he did not
know if police came to his neighborhood to meet Ms. Jones, that he did not
see police speaking with Ms. Jones, and that the only time he ever saw any
police officers was when he was taken into custody. Ayoola dep., p. 87, line
5-10.

8.

Claimant does not controvert the allegations of Paragraph 8 with regards to whether Ms. Jones was upset. Claimant denies the allegations of Paragraph 8 to the extent that Ms. Jones was crying. Ayoola deposed that while she was in the home, Ms. Jones was upset, but that she was not crying. Ayoola dep., p. 84, lines 12-14, p. 93, lines 11-17.

9.

Denied. Although the citations to the record offered by the Government in support of this assertion suggest that Jones told officers that Ayoola owned several firearms, none of them suggest that Jones ever told officers that Ayoola had been smoking marijuana. Neither of the incident reports filed by Officers Davis or Foster contained any statement that Ms. Jones reported that Ayoola was smoking marijuana, nor does Ms. Jones' three page handwritten statement reflect this assertion. See Davis dep., Ex. 1, 3 and 4; Foster dep., Ex. 1, 3 and 4. Although the Government cites p. 91, lines 7-19 of Ayoola's deposition as proof of Ms. Jones' statement, that portion of Ayoola's deposition only suggests that Ayoola had a holster for one of his guns. Ayoola dep., p. 91, lines 7-19.

10.

Denied. Nowhere in the statement written by Ms. Jones does she state that Ayoola actually pointed a pistol at her or threatened to harm her. Davis dep, Ex.3; Foster dep., Ex. 3. Ms. Jones' statement indicates that when she asked Ayoola to let her go, Ayoola in fact did so. Id., Ayoola dep., p. 84, lines 12-19.

11.

Not controverted.

12.

Denied. Ayoola allowed Ms. Jones to leave of her own free will after she asked to leave. Ex. 3, p. 3 to Davis dep., Foster dep.; Ayoola dep., p. 84, lines 17-19.

13.

Claimant Ayoola is without personal knowledge or information sufficient to form a belief as to the truth of the matters asserted in Paragraph 13, and can therefore neither admit nor deny the same. Ayoola deposed that after Ms. Jones left the residence, that he went to sleep and never heard anyone knocking on the door. Ayoola dep., p. 88, lines 10-19; p. 96, lines 1-19.

14.

Not controverted.  Ayoola testified that he awoke when he heard the telephone ringing, followed by a voice on a bullhorn. Ayoola dep., p. 87, lines 14-21.

15.

Denied.   Ayoola testified that he awoke when he heard the phone ringing, followed by a voice on a bullhorn, and that he exited the home fairly quickly after being awakened. Ayoola dep., p. 87, lines 14-25, p. 98, line 17 – p. 99, line 1.  Ayoola is unaware of any other attempt to contact him.

16.

Claimant does not controvert the allegations of Paragraph 16 with respect to where Officers Foster or Davis may have walked.  Claimant denies the remaining allegations of Paragraph 16.  Ayoola denies blackening out any windows to his home.  The officers gave conflicting statements with respect to what they observed with respect to the windows.  Officer Davis testified that all he knew was that the windows were covered with "black plastic," such as a plastic bag. Davis dep., line 18-22.  Officer Foster testified that he believed that the windows were "tinted darkly." Foster dep., p. 13, line 21 - p. 14, line 1.  Ayoola deposed that the windows on his house did not have anything on them, did not have anything black or plastic on

them, and were not tinted. Ayoola dep., pp. 97 line 14 - p. 98, line 2.  Color photographs of the rear of the residence apparently taken on the morning of August 1, 2007 show the shades to the home being drawn, and although the window frames themselves are black, they do not otherwise show any kind of tinting or black tape or plastic on the panes. See Ayoola dep., Ex. 1, p.1.

17.

Not controverted.

18.

Not controverted.

19.

Not controverted.

20.

Not controverted.

21.

Not controverted.

22.

Not controverted.

23.

Not controverted with respect to the assertion that a Clayton County police officer used the PA system on a patrol car to try to speak to Ayoola,

denied with respect to the assertion that Ayoola did not respond to the officer's request to answer the telephone or to exit the house. Ayoola testified that he awoke when he heard the phone ringing, followed by a voice on a bullhorn, presumably the negotiator referred to in paragraph 23, and that he exited the home no more than two or three minutes after being awakened. Ayoola dep., p. 87, lines 14-25, p. 98, line 17 – p. 99, line 1.

24.

Not controverted.

25.

Denied.   After speaking with his mother, Ayoola exited his home from a side door with his hands in the air, but denies that he ever agreed with anyone to surrender. Ayoola dep., p.100, lines 17-25. More significantly, the police incident report prepared by Officer Davis reflects that Ayoola was formally arrested and placed into custody at 8:20 a.m., not 10:00 a.m as asserted by the Government. Davis dep., Ex. 1, p. 3.  In fact, in reviewing the citations provided by the Government in support of the Paragraph 25 assertions, there is nothing to support or suggest that it was 10:00 a.m. when Ayoola exited the home.  Davis testified that he arrived shortly after being dispatched to the location at 6:35 a.m. and that he was on scene prior to 7:00 a.m. Davis dep., p. 9, lines 1-3, p. 10, lines 8-15.  Davis further deposed that

based on the timeline of his incident report that he believed that Ayoola exited the residence around 8:30 a.m., and that Ayoola was in custody possibly "two hours after I got there. I don't think it was two hours after SWAT got there." Davis dep., p. 22, lines 5-8, p. 39, lines 10-16. Foster deposed that Ayoola came out of his own accord, but never identified what time this occurred, only that he had been at the rear of the house for "just over an hour," after testifying that he arrived at the scene just a few seconds behind Davis. Foster dep., p. 12, lines 12-13; p. 17, line 9, p. 18, lines 2-10. Agent Ballard acknowledged that Ayoola exited the residence sometime before 9:00 a.m. Ballard dep., p. 23, lines 11-14. Ayoola repeatedly deposed that he had no idea what time it was when he exited the home, but that it was very shortly after he awoke to the sound of his telephone ringing and the police PA system. Ayoola dep., p. 98, line 20-25, p. 101, line 2 - p. 102, line 14.

### 26.

Not controverted.

### 27.

Claimant Ayoola is without personal knowledge or information sufficient to form a belief as to the truth of the matters asserted in Paragraph 27 and can therefore neither admit nor deny the same. Ayoola does not

know the identity of the officers that were standing near his home or that arrested him, only that the individuals appeared to be members of a SWAT team. Ayoola dep., p. 87, lines 22-25, p. 103, lines 10 through p. 104, line 19. Ayoola further does not have any personal knowledge or information regarding what Officer Foster believed he may have smelled, though Officer Foster, who had no narcotics training at the time, later claimed he could smell the difference between fresh cut marijuana and smoked marijuana. Foster dep., p. 25, lines 3-14.

28.

Not controverted with respect to the assertion that Ayoola may have had an odor of marijuana coming from his person. Denied as to the assertion that Jones did not have the odor of marijuana coming from her person. As to Jones, Davis deposed that "[a]t the time, I didn't really pay a lot of attention in reference to her smell, or an odor coming from her." Davis dep., p. 50, lines 4-6.

29.

Not controverted

30.

Denied. Ayoola surrendered on the driveway of his home and was unarmed, and officers at the scene were well aware that he was alone inside

of the home before exiting the home. Ayoola dep., p. 998, line 20 – p. 99, line 4; Foster dep., p. 17, lines 9-14; Davis dep, p. 21, lines 2-20. Ayoola asserts that the "protective safety sweep" was merely a pretext for entering his home without a warrant.

31.

Denied to the extent that Officer Foster was conducting a protective sweep. See Clamant's response to Paragraph 30 above. Claimant Ayoola is otherwise without personal knowledge or information sufficient to form a belief as to the truth of the matters asserted in Paragraph 31 with regards to what Foster believed he may have smelled, and can therefore neither admit nor deny the same. Ayoola deposed that he did not grow or store any marijuana, and that the marijuana that was in his possession was in a small plastic bag. Ayoola dep., p. 107, lines 8-17.

32.

Claimant Ayoola is without personal knowledge or information sufficient to form a belief as to the truth of the matters asserted in Paragraph 32 with regards to what Foster may have believed, and can therefore neither admit nor deny the same. At the time of the search of Ayoola's home, however, Foster had no experience as a narcotics officer. Foster dep., p. 36, lines 11-22. Foster further acknowledged that Agent Ballard, with 24 years

experience in narcotics, had more training and experience than he did, and Ballard deposed that the residence "smelled like smoked marijuana, like it had been burnt," and that such a smell could linger, but never mentioned that he ever smelled or could distinguish the smell of "fresh-cut" marijuana. Id., Ballard dep., p. 29, line 12-p. 30, line 15.

32.

Claimant Ayoola is without personal knowledge or information sufficient to form a belief as to the truth of the matters asserted in this second Paragraph 32 with respect to what Foster believes he may have smelled, and can therefore neither admit nor deny the same.  Ayoola avers that it is unlikely Foster could have smelled anything outside of the residence in any case, because Ayoola closed the door to the residence when he exited the home. Affidavit of Tony Ayoola, ¶11.

33.

Claimant is without personal knowledge or information sufficient to form a belief as to the truth of the matters asserted in Paragraph 33 with respect to what Davis may have smelled, and can therefore neither admit nor deny the same.  Ayoola admitted that he and Ms. Jones had smoked marijuana together during the early morning hours of August 1, 2007, and

that he subsequently smoked more marijuana after Ms. Jones left the home. Ayoola depo., p. 106, line 12 – p. 107, line 17, p. 112, lines 15-25.

34.

Denied.  Officer Davis testified only that it was possible other officers could have been in the house at the time that he was in there, but as he deposed, "I might have seen an officer, but I can't recall they was doing in there.  I can't recall who was in there." Davis dep., p. 47, lines 11-23.  Davis further testified he could not even say whether a security sweep was performed, an assertion Claimant has already denied.  See Claimant's response to Paragraphs 30 and 31 above; Davis dep., p. 33, lines 8-16.

35.

Denied to the extent that Foster was performing a protective sweep of the house. See Claimant's response to Paragraphs 30 and 31 above. Admitted to the extent that there were firearms in plain view inside of the home.

36.

Denied.  Ayoola avers that the ammunition can "observed" by Foster was actually located behind a bar in the downstairs area of the home and was not in plain view. Ayoola aff., ¶13.

37.

Not controverted.  It appears that Foster simply seized all firearms in the home regardless of whether they were in plain view.  When questioned about his seizure of the firearms, Foster could not determine what firearms he seized during the initial search of the residence and what firearms he supposedly seized after the search warrant was issued. Foster dep., p. 23, line 14-25; p. 33, line 10 – p. 34, line 15.  Ayoola further deposed that after being taken into custody, aside from the fact that a number of officers from different jurisdictions immediately entered his home, an officer demanded a key to a glass-faced gun cabinet in the downstairs area of the house and that if Ayoola "didn't release it to them, that they would have to bust the case. So I told them where the key was.  The officer, I'm not exactly sure what officer it was or his name." Ayoola dep., p. 82, line 17 – p. 83, line 25; p. 104, lines 5-22, p. 103, line 10- p. 106, line 11.

38.

Not controverted.

39.

Not controverted.

40.

Denied.  The Morant Drive property appears to have been secured by the hordes of police officers that immediately entered the home after Ayoola was arrested. Foster dep., p. 21, line 3 – p. 22, line 3; Ayoola dep., p. 103, line 17 – p. 104, line, p. 106, lines 2-11.

41.

Not controverted.

42.

Not controverted.

43.

Not controverted, although Davis' statements about his Incident Report should not be construed to suggest that his report of the incident was completely accurate.  By way of example, although Davis' report suggests that Ayoola pointed a handgun at Ms. Jones, Ms. Jones never mentioned that Ayoola ever pointed a firearm towards her in her three page statement.  See Davis dep., Ex. 1 and Ex. 3.

44.

Not controverted.

45.

Not controverted.

46.

Denied.  When asked if he observed anyone entering the home after the initial sweep, Officer Foster deposed that he was working on paperwork with Officer Davis and that he "wasn't guarding per se the residence.  I was more with the vehicle with the weapons in it." Foster dep. p. 28, lines 5-8. Foster further deposed that several narcotics officers showed up and that they "just started trickling in – a few at a time." Id., lines 16-18.  Foster also never actually saw the search warrant; as he deposed "I'm assuming that the warrant was issued when I went back in." Id., p. 29, lines 2-3.  Officer Davis testified that although he was not a part of the team conducting the security sweep, that he entered the house after Ayoola was secured, but before he transported him to jail. Davis dep., p. 23, lines 15-25.  He estimated that it was still during the morning hours when he stepped into the house through a side door Id., p. 24, lines 3-12; p. 25, lines 20 – p. 26, lines 1-16.  When questioned as to what the legal basis of his entry into the home might have been, he testified that "they got a Warrant. They got a Search Warrant for the home." Id., p. 26, lines 20-25. He subsequently backtracked, however and acknowledged that he did not actually know whether a search warrant had been issued at the time he entered the residence. Id., p. 27, lines 13-22.

Finally it appears that Ayoola was in custody by 8:20 a.m., and an inventory reported completed at 9:00 a.m. – three hours *before* Ballard obtained a search warrant – lists items found in the house that could have only been obtained pursuant to a full search of the home. See Ex. 5 to Davis dep., Foster dep and Ballard dep. Ayoola also deposed that during the short time he was at the scene, he observed police officers wearing three different uniforms swarm into his home. Ayoola dep., p. 103, line 17 – p. 104, line 5, p. 106, lines 2-11.

47.

Denied. Ayoola avers that when exited the residence, he closed the door behind him. Ayoola Aff., ¶11.

48.

Not controverted.

49.

Not controverted with respect to the assertion that Officer Ballard called officers at the Morant Drive property to advise that he had a search warrant. Denied with respect to the assertion that the officers waited to hear from Ballard prior to entering the Morant Drive property and conducting a search. See Claimant's response to Paragraph 46 above.

50.

Claimant Ayoola is without personal knowledge or information

sufficient to form a belief as to the truth of the allegations of Paragraph 50

with respect to what Officer Foster believed he could "still smell," and can

therefore neither admit nor deny the same.  Officer Foster deposed that he

never actually saw the search warrant. Foster dep., p. 29, lines 2-5.

51.

Claimant Ayoola is without personal knowledge or information

sufficient to form a belief as to the truth of the allegations of Paragraph 51

with respect to what Agent Ballard believed that he could smell, and can

therefore neither admit nor deny the same. Claimant Ayoola does not

controvert that Ballard deposed that the home smelled like burnt marijuana

or that he had been smoking marijuana in the home.

52.

Denied.  None of the citations provided by the Government support

the assertion that the safe was "discovered" during the search executed

pursuant to Ballard's warrant, as opposed to being discovered and forced

open well beforehand.  The contents of the safe are listed on a three page

inventory report completed 45 minutes after Ayoola's arrest, but over three

hours before Agent Ballard returned with the search warrant, indicating that

the safe was located and opened before a search warrant was issued.  See Ex.

5 to Davis dep., Foster dep., and Ballard dep, pp. 1-3.  Ballard further

deposed that he could not say whether there had been an attempt to open the

safe prior to his arrival at the scene. Ballard dep., p. 33, lines 7-10.  See also

Claimant's response to Paragraph 36 above.

53.

Denied.  From the damaged appearance of the safe, Claimant Ayoola

believes that the safe was forcibly opened with a crowbar or other such

device and sawed open. Ayoola Aff. ¶15.  Ballard testified that he was not

positive that a locksmith was called. Ballard dep, p. 32, lines 5-17.

54.

Not controverted.  It appears officers also seized the title to several

vehicles owned either by Ayoola or his auto business. Ayoola Aff., ¶14.

55.

Not controverted.

56.

Not controverted.

57.

Not controverted.

58.

Not controverted.

59.

Denied to the extent that the term "search" refers to any search supposedly conducted after issurance of a search warrant.  The heat-seal plastic bags are listed on an inventory of items seized from the home long before a search warrant was issued. See Ex. 3, p. 2 to Foster dep.

60.

Not controverted.

61.

Claimant Ayoola is without personal knowledge or information to form a belief as to the truth of the allegations of Paragraph 61 with respect to what Officer Ballard has been trained to know, and can therefore neither admit nor deny the same. Ayoola deposed that he kept a vacuum sealer in a utility room directly across from the laundry room, and a meat freezer in the hallway in between the utility and laundry room. Ayoola dep. p. 111, line 20 – p.112., line 12.

62.

Claimant Ayoola is without personal knowledge or information to form a belief as to the truth of the allegations of Paragraph 62 with respect to

what Officer Ballard has been trained to know, and can therefore neither admit nor deny the same.  Ayoola further objects to any characterization of his residence as a "narcotics 'stash' house."

63.

Claimant Ayoola is without personal knowledge or information to form a belief as to the truth of the allegations of Paragraph 63 with respect to what officers may have observed.  Ayoola did depose that he had smoked marijuana in or near the laundry room. Ayoola dep., p. 112, lines 18-23.

64.

Not controverted.  Ayoola deposed that the handwritten notations appeared to be scribblings reflecting his payment of bills and receipts and that he kept a number of personal bills in that night stand. Ayoola dep., p. 113, line 11 – p. 120, line 11.

65.

Claimant Ayoola is without personal knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 65 with respect to what Agent Ballard is trained to know, and can therefore neither admit nor deny the same.  Ballard also acknowledged that to the extent that the handwritten scribblings were in fact a ledger, that it was not apparent what the scribblings were for. Ballard dep., p. 59, lines 17-20.

66.

Denied.  Ayoola denied flushing or putting any marijuana in the toilet.

Ayoola dep. p. 120, lines 17-22.  Moreover, although the Government has

attached photographs of the toilet tank that supplies water to the basin

claiming that the "flecks" of what appear to be mold in the tank are

marijuana residue, the Government has failed to demonstrate in any way

what the flecks actually are, much less whether they are in fact marijuana

residue, which Ayoola denies, nor has the Government demonstrated how

flushing marijuana in a toilet basin could have resulted in marijuana residue

appearing in the water supply tank above the basin. Id., See Ex. 1, p. 17.

67.

Not controverted with respect to the fact that items listed in Paragraph

67 were seized from Claimant's home. Denied to the extent that the term

"search" as used in Paragraph 67 connotes execution of the search warrant.

Each of the items listed in Paragraph 67 were listed on a three page

inventory of seized items prepared at 9:00 a.m., at least three hours before

12:04 p.m. issuance of the search warrant. Ex 5, 6, to Davis dep., Foster dep.

and Ballard dep.  Claimant Ayoola further deposed that he was taken from

the scene following his arrest very quickly, but even as he was leaving, he

noticed at least three different types of officers going in and out of his home. Ayoola dep., p. 103, line 10 – p. 106, line 11.

68.

Denied to the extent that the firearms that were in the locked cabinet are asserted to have been seized during execution of the search warrant. Ayoola deposed that after being taken into custody, an officer demanded a key to a glass-faced gun cabinet in the downstairs area of the house and that if Ayoola "didn't release it to them, that they would have to bust the case. So I told them where the key was. The officer, I'm not exactly sure what officer it was or his name." Ayoola dep., p. 82, line 17 – p. 83, line 25; p. 104, lines 5-22. Officer Davis testified that he otherwise transported Ayoola from the scene very shortly after he was taken into custody, well before the 12:04 pm issue date of the search warrant. Davis dep. p. 23, lines 20-25 – p. 24, lines 1-7; see also Exhibit 5. Foster otherwise could not determine what firearms he seized during the initial search of the residence and what firearms he supposedly seized after the search warrant was issued. Foster dep., p. 23, line 14-25; p. 33, line 10 – p. 34, line 15; see also Exhibit 5. Finally, the firearms are all listed on the inventory sheet of seized items prepared at least three hours before a search warrant was issued, indicating

seizure prior to execution of the search warrant. Ex. 5, 6 to Davis dep.,

Foster dep. and Ballard dep.

69.

Denied.  Ballard never specified the basis upon which the Defendant

Currency and the Defendant Jewelry were seized.  When specifically

questioned as to whether there was anything to suggest that the money was

earned through drug trafficking or was to be used for drug trafficking,

Ballard responded that "[t]here's no evidence for it or to the contrary."

Ballard dep. p. 45, lines 18 – p. 46, line 1.  When questioned about the

jewelry, Ballard further acknowledged that while "quite often we find that

people trade jewelry for drugs," and that "people who are involved in drug

trafficking like to invest in jewelry and coins," he further acknowledged that

with respect to Ayoola, "I can't say this happened in this case . . ." Id., p. 46,

lines 15-22.

70.

Not controverted, although Officer Foster could not determine what

firearms he seized during the initial safety sweep of the residence and what

firearms he supposedly seized after the search warrant was issued; it appears

all of the weapons were seized prior to issuance of the search warrant. Foster

dep., p. 23, line 14-25; p. 33, line 10 – p. 34, line 15; Ex. 5, 6.  Agent Ballard

deposed that in the absence of a pending criminal case and in the absence of a felony conviction, all of the firearms should be released back to Claimant. Ballard dep., p. 26 line 6 – p. 27, line 5; p. 29, lines 3-11.

71.

Claimant Ayoola is without personal knowledge or information sufficient to form a belief as to the truth of the matters asserted in Paragraph 71 with respect to what Officer Foster was trained to know, and can therefore neither admit nor deny the same. Claimant Ayoola has otherwise steadfastly denied that he is a drug dealer or a drug trafficker and the record demonstrates that Officer Foster was well aware that Ayoola had owned firearms for well over ten years. See Ayoola dep., p. 68, line 18 – p. 69, line 1; Foster dep., p. 7, line 24-25 – p. 10, line 16. See also Government's "Motion for Summary Judgment," Ex. 6, Doc. No. 29-22, p. 2, 8, 12 and 19, which reflect purchases of many of the firearms described in this motion back to 1997.

72.

Not controverted.

73.

Not controverted.

74.

Not controverted.

75.

Not controverted.

76.

Not controverted.

77.

Not controverted.

78.

Not controverted.

79.

Not controverted.

80.

Not controverted.

81.

Not controverted.

82.

Not controverted.

83.

Not controverted.

84.

Not controverted.

85.

Not controverted.

86.

Denied.  Officer Turnipseed testified that she could recall at least five instances where Max gave an alert and no marijuana was found. Turnipseed dep. p. 14, line 18 – p. 15, line 2.

87.

Not controverted.  In fact, Max's nose is so sensitive, that Officer Turnipseed deposed that Max could detect even the odor of second-hand marijuana smoke settling on an item, or the residual odor of marijuana coming from someone who had smoked marijuana, and then touched the item Max was being asked to sniff. Turnipseed dep., p. 16, line 1-17.

88.

Not controverted.

89.

Not controverted.

90.

Not controverted.

91.

Not controverted.

92.

Not controverted.

93.

Not controverted.

94.

Not controverted.

95.

Not controverted, although Ayoola deposed that the shoplifting charge occurred when he was 17 years old and he was charged as a party to a crime. As an adult, Ayoola has otherwise never been convicted of anything more serious than a traffic ticket and he has no drug related arrests of any kind. Ayoola dep., p. 50, line 2- p. 52, line 14.

96.

Not controverted.

97.

Not controverted.

98.

Not controverted.

reported all of his income from all of his sources on his income tax returns," when the question asked of Ayoola was simply, "did you report all of your income on your income tax returns?" See Ayoola dep., p. 27, lines 10-24.

109.

Not controverted.  Ayoola, unable to afford the $52.00 service fee charged by the IRS per year required for a full transcript of his return, produced only summaries that could be obtained by telephone for free. Ayoola dep., p. 29, lines 7- p. 30, line 4.  Ayoola was also willing to sign an authorization to allow the Government to obtain his full transcripts, but the Government declined to do so. Id. dep. p. 30, lines 5-15

110.

Not controverted.

111.

Not controverted.

112.

Not controverted.

113.

Not controverted.

114.

Not controverted.  Ayoola did not testify, however, that the BB&T account was the sole means by which Tony's Used Auto Sales purchased vehicles.

115.

Not controverted.

116.

Not controverted.

117.

Not controverted.

118.

Not controverted.

119.

Not controverted.

120.

Not controverted.

121.

Not controverted.

122.

Not controverted.

123.

Not controverted.  It bears mentioning, however, that the BB&T home equity line of credit is not the only lump sum source of cash that Ayoola accessed in the 12 month period preceding his August 1, 2007 arrest.

124.

Not controverted.

125.

Denied to the extent that the Rochell's Diamonds records reflect the February 25, 2005 purchase, not controverted with respect to the March 25, 2005 and April 3, 2005 purchases.  See "Motion for Summary Judgment," Ex. 5, Doc. 29-21, pp. 1-4.  Ayoola also deposed that he owes around $20,000 on his credit cards. Ayoola dep., p. 37, lines 12-17.

126.

Claimant Ayoola is without personal knowledge or information sufficient to form a belief as to the truth of the matters asserted in Paragraph 126 with respect to what records Rochell's Jewelers may or may not have had.  Rochell's Jewelers produced a total of two receipts for purchases made by Ayoola in March and April of 2005, and did not produce any other records. "Motion for Summary Judgment," Exhibit 5, Doc. 29-21, pp. 1-4.

127.

Not controverted.

128.

Not controverted with respect to Ayoola's testimony with respect to trying to keep the home equity line of credit account up date. Denied with respect to Ayoola's testimony as to when the home equity line of credit first became delinquent. Although Ayoola testified that the home equity line was certainly delinquent after August 1, 2007, he did not depose that it first became delinquent at that time. Ayoola dep., p. 58, line 25 – p. 59, line 6.

129.

Not controverted to the extent that BB&T documents show that Ayoola became past due with a monthly payment due on the line of credit on July 15, 2006. Ayoola was not actually served with a notice of delinquency until September 26, 2006, and the balance of the home equity line was not formally demanded and accelerated until October 30, 2006. "Motion for Summary Judgment, Ex. 1, Doc. 29-4, pp. 27-30.

130.

Not controverted.

131.

Not controverted.

II.    CLAIMANT'S STATEMENT OF MATERIAL FACTS AS
       TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED:

1.

Whether Mr. Ayoola was arrested at 8:20 a.m.  Davis dep., p. 22, lines

5-8, p. 3, lines 10-16, Ex. 1.

2.

Whether Mr. Ayoola arrested outside of his home. Ayoola dep., p. 98,

line 20 – p. 99 line 4.

3.

Whether Mr. Ayoola was unarmed at the time of his arrest. Davis

dep., p. 21, lines 2-20.

4.

Whether Mr. Ayoola voluntarily surrendered at the time of his arrest.

Foster dep,. p. 17, lines 9-14.

5.

Whether Mr. Ayoola or Ms. Jones consented to a search of Mr.

Ayoola's home. Ballard dep., p. 25, lines 4-17; Ayoola dep., p. 6, line 7 – p.

7, line 17.

6.

Whether Clayton County police officers entered and searched Mr.

Ayoola's home before obtaining a search warrant. Foster dep., p. 17, lines 6-

9, p. 18, lines 11-18, p. 20, line 5 – p.21 line 2, p. 21, line 24 – p. 22, lines 3-7; Davis dep., p. 23 line 20 – p. 26, line 13; Ayoola dep., p. 103, line 17 – p. 104, line 5; Settle dep., p. 22, line 14 – p. 24, line 9, Ex. 5 and 6; Ballard dep., p. 21, line 5 – p. 22, line 2, Ex. 5 and 6.

7.

Whether Clayton County police officers were justified in entering and searching Mr Ayoola's home before obtaining a search warrant. Ballard dep., p. 23, line 22 – p. 24, line 8, Settle dep., p. 35, line 11 – p. 36, line 16.

8.

Whether the items seized from Mr. Ayoola's home listed on the Government's inventory were seized before 12:04 p.m. Ex. 5, 6 to Davis dep., Foster dep. and Ballard dep.

9.

Whether a search warrant was obtained at 12:04 p.m. Ballard dep., Ballard dep., p. 21, line 5 – p. 22, line 2, Ex. 6, pp. 1-2.

10.

Whether the source of the Defendant Currency was a $40,000 home equity line of credit opened by Mr. Ayoola. "Motion for Summary Judgment," Ex. 4, Doc. 29-20, pp. 6-17; Ex. 7, p. 13, Ayoola dep., p. 37, lines 1-24.

11.

Whether the source of the Defendant Jewelry was a combination of the home equity line of credit opened by Mr. Ayoola, his credit cards and the Bank of America business account held by Mr. Ayoola for Tony's Collision. Ayoola dep., p.72, lines 1-6; "Motion for Summary Judgment," Ex. 2, Doc. 29-13, p. 11, Ex. 5, doc. 29-21, p. 4.

Respectfully submitted this __2nd__ day of November, 2009

/s/ Bruce F. Morriss                .
Bruce F. Morriss
Attorney for Claimant
Georgia Bar No. 525303

/s/ Daniel Shim                .
Daniel Shim
Attorney for Claimant
Georgia Bar No. 642749

MORRISS & SHIM, LLC
934 Glenwood Avenue – Suite 150
Atlanta, GA  30316
(404) 525-8000

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )
                             )        CIVIL ACTION FILE
        - versus -           )        NO. 1:08-CV-0113-CC
                             )
$33,330.00 IN UNITED STATES  )
CURRENCY and TEN PIECES OF   )
JEWELRY VALUED AT $27,750.00,)
                             )
        Defendants.          )

## CERTIFICATE OF FONT TYPE, SIZE AND SERVICE

I hereby certify that I have prepared the foregoing Claimant's

Statement of Material Facts As to Which There is No Genuine Issue to be

Tried pursuant to Local Rule 5.1, using Times New Roman 14 point type,

and have this day electronically filed the same with the Clerk of Court using

the CM/ECF system, which will automatically send e-mail notification of

such filing to the following attorneys of record:

Michael Brown, Esq.
Assistant U.S. Attorney
Suite 600
75 Spring Street, S.W.
Atlanta, GA  30303

This 2nd day of November, 2009.

                                        /s/ Daniel Shim_____
                                        Daniel Shim
                                        Georgia Bar No. 642749
                                        Attorney for Claimant

MORRISS & SHIM, LLC
934 Glenwood Avenue, SE, Suite 150
Atlanta, Georgia  30316
 (404) 525-8000